UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
X-------------------------------------------------X

MONARCH PARTNERS, LLC,

             Plaintiff,

   v.

GIA WALSH, individually and d/b/a
GG FILMS, LLC,

             Defendant.
X-------------------------------------------------X

Case No.:24-cv-9927

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Monarch Partners, LLC, ("Plaintiff" or "Monarch") by its attorneys, Adelman Matz, P.C., for its Complaint against Defendant Gia Walsh ("Walsh" or "Defendant"), individually and d/b/a GG Films, LLC ("GG"), alleges as follows:

## NATURE OF THE CASE

1. This is an action by Plaintiff for breach of contract and promissory fraud.

## THE PARTIES

2. Plaintiff is a Nevada limited liability company with its principal place of business in Davidson County, Tennessee.

3. Monarch is the largest investor in a film currently titled, "Allswell in New York" (the "Film").

4. Upon information and belief, Defendant Walsh is an individual resident of the state of New York.

5. Upon information and belief, in addition to the amounts Walsh owes to Plaintiff under various agreements, Walsh is the principal architect of the fraudulent scheme at issue in this matter, which resulted in deprivation of Monarch's rights and a proposed fraudulent tax scheme,

which Monarch rejected, and which would have given Monarch a tax deduction equal to *five (5) times* its investment pursuant to a K-1 for an entity of which it has never even been a member.

6. Upon information and belief, Defendant Walsh does business as ("d/b/a") GG and is a member and/or manager of GG.

## JURISDICTION AND VENUE

7. Upon information and belief, this Court has subject-matter jurisdiction of this cause under 28 U.S.C. §1332(a)(1) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00).

8. Upon information and belief, this Court has personal jurisdiction over the Defendant, pursuant to CPLR §301, because Defendant resides in the State of New York.

9. Upon information and belief, venue is proper pursuant to 28 U.S.C. §§1391(b)(1)-(2), respectively, because Defendant resides in this judicial district and because a substantial part of the events/occurrence giving rise to the Plaintiff's claims occurred in this judicial district and Defendant is subject to personal jurisdiction in this judicial district.

## FACTUAL ALLEGATIONS

10. Monarch and Roller Coaster, LLC ("Roller Coaster") entered into identical investor financing agreements in 2021 and 2022 (collectively, the "Investor Financing Agreements"). True and correct copies of the Investor Financing Agreements are collectively attached hereto as **Exhibit 1**.

11. Upon information and belief, Walsh is a member of Roller Coaster.

12. Pursuant to the Investor Financing Agreements, Monarch invested $453,000.00 in the Film.

13. The Investor Financing Agreements also provide that, "Roller Coaster warrants that the Investment is the total amount of money needed to complete and deliver the Film for festival screenings and/or Distribution."

14. The Investor Financing Agreements further provide that "[Monarch] shall also receive a return on investment ('ROI') of twenty percent (20%)."

15. Additionally, the Investor Financing Agreements provide that "[o]nce all equity investments and the ROI are paid, [Monarch] shall receive, pro-rata, pari passu with any other equity investors, an amount equal to Fifty Percent (50%) of the Distribution Funds." Distribution Funds is defined as gross income less loans, residuals, taxes, or deferments.

16. The Investor Financing Agreements were ratified via management resolution of Roller Coaster, dated April 18, 2022 (the "Management Resolution"). A true and correct copy of the Management Resolution is attached hereto as **Exhibit 2**.

17. The Management Resolution provides, Monarch "shall have approval over the final budget of the Film, any proposed distribution deal for the Film, and all other major business decisions associated with the Film."

18. The Management Resolution further provides, "Monarch [is] to be provided with all information and documentation that it requests, including a detailed line-item accounting of financial statements for the film as updated."

19. Pursuant to an Investment Agreement dated October 6, 2021, Walsh agreed to invest $300,000.00 into "Cabin Girl" or another film or films designated by Monarch. This agreement provides that this was in consideration of Monarch's initial investment of $300,000.00 into the Film. A true and correct copy of this agreement is attached hereto as **Exhibit 3**.[1]

---

[1] This agreement mistakenly calls Monarch Partners, LLC "Monarch Partners NV, LLC".

20. Walsh failed to invest $300,000.00 into "Cabin Girl" or another film or films designated by Monarch.

21. On April 18, 2022, Walsh, individually, entered into two agreements with Monarch: (1) Acknowledgement of Default of Investment Agreement and Personal Guarantee, and (2) Repayment & Personal Guarantee Agreement (the "Walsh Default Agreements").

22. Under the Acknowledgement of Default of Investment Agreement and Personal Guarantee, Walsh agreed to pay Monarch the sum of $235,000.00 on or before December 31, 2022, which represents the amount Monarch invested into the film "Cabin Girl" on behalf of Walsh. A true and correct copy of this agreement is attached hereto as **Exhibit 4**.

23. Under the Repayment & Personal Guarantee Agreement, Walsh guaranteed repayment to Monarch of its full investment of $453,000.00 if the sales price of the Film did not cover Monarch's total investment, plus a 20% return. Although the Film has been licensed for distribution (not sold), Monarch has not been repaid any of its investment. A true and correct copy of this agreement is attached hereto as **Exhibit 5**.

24. On April 19, 2023, Monarch, through counsel, demanded repayment from Walsh pursuant to the Walsh Default Agreements. A true and correct copy of this letter is attached hereto as **Exhibit 6**.

25. Upon information and belief, on August 30, 2023, unbeknownst to Monarch at the time, Roller Coaster, through Walsh, entered into a License Agreement with Scatena & Rosner Media, LLC ("S&R") pursuant to which Roller Coaster licensed exclusive distribution rights in and to the Film to S&R for fifteen (15) years (the "License Agreement").

26. Upon information and belief, the License Agreement granted S&R "sole and absolute discretion over the exploitation of the [Film]."

4

27. Upon information and belief, in the License Agreement, Roller Coaster represented to S&R that it had full authority to enter into the License Agreement and that Roller Coaster had not granted any contrary rights in the Film.

28. Upon information and belief, in the License Agreement, Roller Coaster also agreed to indemnify S&R for breaches of the agreement, including its representations and warranties.

29. In September of 2023, Monarch learned that, pursuant to a series of agreements dated June 2022 (the "181 Agreements"), Roller Coaster, through Walsh, attempted to perpetrate a Section 181 tax scheme that included Monarch, without Monarch's permission or approval.

30. Specifically, Roller Coaster did the following:

   a. assigned all rights in and to the Film to a third party in exchange for an unknown sum that was equal to or greater than $3,805,013.00;

   b. permitted that third party to attorn (sic) all rights in the film to yet another third party;

   c. entered into a sub-distribution agreement with yet another third party pursuant to which Roller Coaster guaranteed that the Film would produce a minimum amount of gross income equal to 130% of $3,805,013.00 (collectively the "181 Scheme").

31. The 181 Agreements were signed in furtherance of a tax deduction under Section 181 of the Tax Code.

32. Upon information and belief, §181 of the Tax Code permits a 100% deduction for the first $15 million of the cost of producing a film that is shot in the U.S. Upon information and belief, this section allows an investor in a film to deduct at least some monies invested. Upon information and belief, however, if the film results in a return of the investment, the return is fully taxable.

33. According to one legal commentator[2]:

> Entering into a tax shelter scheme (where the initial tax savings exceed the cash investment) based on Section 181 is an even sillier strategy, since these schemes typically involve (a) inflating the value of the film, (b) leveraging the investment with purported "debt" that later magically disappears, and (c) transaction costs that far exceed the small tax benefit of deferral. These deals are prime targets for the IRS, and if audited, the taxpayers will end up with massive tax and penalty assessments.
>
> For investors, Section 181 tax shelter schemes are easy to spot. The promoters pander to greed and promise tax savings in excess of the investment. They obviously fail to mention the investor's tax liability in following years and the high risk of disaster if there is an IRS audit. If investors have any competent advisors, they should run when they hear a proposal like this that is too good to be true.

34. Upon information and belief, only the owner of a film may elect to deduct production costs under Section 181. Upon information and belief, therefore, Monarch was not entitled to take any such deduction.

35. Upon information and belief, in furtherance of the 181 Scheme, Roller Coaster provided Monarch with a K-1 for the 2022 tax year issued by a different company showing a deduction of $2,423,442 and allocated recourse debt of $2,105,704.00 in connection with the Film.

36. Upon information and belief, there was no basis for this incredibly high number. Monarch had invested less than twenty percent (20%) of this amount. Basically, Monarch had never been a member of the company that issued the K-1. Thus, it made no sense for it to receive a K-1.

37. Monarch, through its CPA, expressed that the tax deduction was fraudulent, particularly since Monarch had never been a member of the company that issued the K-1.

---

[2] "The Ugly Truth About Section 181 Tax Deduction For Filmmakers", Forbes.com, https://www.forbes.com/sites/schuylermoore/2022/01/19/the-ugly-truth-about-section-181/?sh=367b40004561 (last visited Nov. 18, 2023).

6

38. Roller Coaster's CPA responded that he "does this all the time" and that the "debt" would simply "sit in" the company that issued the K-1 forever, contrary to IRS regulations.

39. Upon information and belief, Walsh, with the knowledge and approval of Roller Coaster, orchestrated the 181 Scheme in an apparent effort to induce Monarch to accept less than it was entitled to under the Walsh Default Agreements and Investor Financing Agreements or otherwise defer action on those agreements.

40. On September 19, 2023, Monarch, through counsel, wrote to Walsh regarding its objection to the 181 Scheme and to demand the amounts due under the Walsh Default Agreements. A true and correct copy of this letter is attached hereto as **Exhibit 7**.

41. A few weeks later, S&R publicly announced it had obtained certain distribution rights for the Film. This was the first time Monarch learned of any distribution or similar agreement between S&R and Roller Coaster.

42. However, when confronted, upon information and belief, Walsh falsely represented to Monarch that there was no such agreement with S&R to distribute the Film.

43. Via letter dated October 18, 2023, Monarch, through counsel, placed S&R on notice of its rights pursuant to the Investor Financing Agreements and Deal Memorandum. A true and correct copy of this letter is attached hereto as **Exhibit 8**.

44. S&R then produced a copy of the License Agreement between it and Roller Coaster, signed by Walsh, from August of 2023.

45. This License Agreement was executed in violation of Monarch's approval rights in the Investor Financing Agreements and Deal Memorandum.

46. S&R also informed Monarch that Walsh had falsely represented to S&R that Roller Coaster had obtained all necessary permissions to enter into the agreement for distribution of the

Film. Upon information and belief, S&R did not request evidence of Monarch's written approval of the License Agreement from Walsh.

47. In fact, upon information and belief, Walsh told S&R and its agents not to return calls regarding the Film from anyone who may be associated with Monarch.

48. Monarch then learned that S&R had entered into one or more distribution or similar agreements related to the Film in violation of Monarch's approval rights in the Deal Memorandum S&R had executed.

49. As a result of these events, Monarch was forced to file a lawsuit in Tennessee to protect its rights under the various agreements referenced above. That lawsuit settled with respect to all defendants except the Defendant in this case, which were dismissed without prejudice (the "Tennessee Lawsuit").

## COUNT I

## BREACH OF CONTRACT - WALSH DEFAULT AGREEMENTS

50. Plaintiff repeats and re-alleges each of the allegations set forth in paragraphs 1 through 49 above as though fully set forth herein.

51. The Walsh Default Agreements are valid and enforceable contracts between Plaintiff and Defendant.

52. Since the Walsh Default Agreements between the parties were entered into, Plaintiff has performed its contractual obligations thereunder.

53. Under the Acknowledgement of Default of Investment Agreement and Personal Guarantee, Walsh agreed to pay Monarch the sum of $235,000.00 on or before December 31, 2022.

54. Under the Repayment & Personal Guarantee Agreement, Walsh guaranteed repayment to Monarch of its full investment of $453,000.00 if the sales price of the Film did not cover Monarch's total investment, plus a 20% return. Although the Film has been licensed for distribution (not sold), Monarch has not been repaid any of its investment.

55. Despite repeated demands, to date, Walsh has not paid the amounts due under the Walsh Default Agreements.

56. Defendant's breach of the Walsh Default Agreements has damaged Plaintiff in an amount to be determined at trial, plus costs and applicable interest.

## COUNT II

## BREACH OF CONTRACT – INVESTOR AGREEMENT

57. Plaintiff repeats and re-alleges each of the allegations set forth in paragraphs 1 through 56 above as though fully set forth herein.

58. The Investment Agreement is a valid and enforceable contract between Plaintiff and Defendant.

59. Since the Investor Agreement between the parties was entered into, Plaintiff has performed its contractual obligations thereunder.

60. Pursuant to the Investment Agreement, Walsh agreed to invest $300,000.00 into "Cabin Girl" or another film or films designated by Monarch.

61. However, to date, Walsh failed to invest any money into any film designated by Monarch, let alone the $300,000.00, as agreed by Walsh.

62. Defendant's breach of the Investor Agreement has damaged Plaintiff in an amount to be determined at trial, plus costs and interest.

9

## COUNT III

## **PROMISSORY FRAUD**

63. Plaintiff repeats and re-alleges each of the allegations set forth in paragraphs 1 through 62 above as though fully set forth herein.

64. The Investment Agreement is a valid and enforceable contract between Plaintiff and Defendant.

65. When the Investor Financing Agreements were executed, Walsh represented to the owners of Monarch that she intended to obtain Monarch's approval of decisions regarding the Film.

66. Upon information and belief, however, at the time Walsh made that representation she knew she did not intend to obtain such approval.

67. This representation was material to the transaction.

68. Monarch reasonably relied upon Walsh's representation.

69. Upon information and belief, further, when Walsh entered into the Walsh Default Agreements, despite representing that she would pay the amounts owed, she knew at that time that she did not and would not have the funds available to pay the amounts set forth therein by the dates agreed upon.

70. Alternatively, upon information and belief, Walsh had no intention of repaying the amounts owed.

71. For example, upon information and belief, at the time the Walsh Default Agreements were executed, Walsh had numerous creditors to which she owed money and numerous liens, such that she eventually filed for bankruptcy (which was recently dismissed).

72. As such, upon information and belief, it is clear that Walsh never had any intention to perform under any of the aforementioned agreements.

73. Monarch reasonably relied upon Walsh's representations that she would satisfy the amounts that Walsh represented that she could and would pay in the Walsh Default Agreements.

74. As a result of Walsh's representations, Monarch was forced to file and engage in litigation in the Tennessee Lawsuit.

75. Upon information and belief, the Tennessee lawsuit was the proximate and natural cause of Walsh's fraudulent conduct.

76. Plaintiff incurred attorney's fees and expenses due to the Tennessee Lawsuit.

77. As result of Walsh's misrepresentations, Defendant has damaged Plaintiff in an amount to be determined at trial, plus interest, in addition to attorneys' fees incurred as a result of filing the lawsuit in Tennessee against all defendants except the defendant in this case.

78. As a result of Walsh's fraudulent conduct, Defendant is entitled to recover the attorneys' fees and costs incurred in the Tennessee Lawsuit.

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

1. Compensatory damages in an amount to be proven at trial, but at least $600,000.00, with applicable costs and interest;

2. Punitive damages for Defendant's intentional, fraudulent, malicious, or reckless conduct, as set forth above;

3. Attorneys' fees incurred as a result of filing the lawsuit in Tennessee against all defendants except the defendant in this case;

4. Pre- and post-judgment interest;

5. That Monarch be awarded such other and further relief as is just.

| Dated: New York, New York<br>December 27, 2024 | Respectfully submitted,<br><br>_____<br>Sarah M. Matz, Esq.<br>Celena E. Stoia, Esq.<br>Barry M. Golden, Esq.<br>ADELMAN MATZ P.C.<br>1159 Second Ave, Suite 153<br>New York, New York 10065<br>Telephone: (646) 650-2207<br>E-mail: sarah@adelmanmatz.com<br>E-mail: cstoia@adelmanmatz.com<br>E-mail: bgolden@adelmanmatz.com<br>*Attorneys for Plaintiff* |
|---|---|